**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

|  |  |
|---|---|
| In re: | ) |
|  | ) |
| PENOBSCOT VALLEY HOSPITAL | ) Chapter 11 |
|  | ) Case No. 19-_____ |
| Debtor. | ) |
|  | ) |

**DECLARATION OF CRYSTAL LANDRY IN SUPPORT OF PENOBSCOT VALLEY HOSPITAL'S CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS**

I, Crystal Landry, declare, pursuant to § 1746 of title 28 of the United States Code, that:

1. I am the chief executive officer ("CEO") of Penobscot Valley Hospital ("PVH"). I have been employed by PVH since April 2015. Prior to becoming CEO, I was concurrently serving as senior director of clinical and administrative operations, the infection control officer, and the patient safety officer. I am trained and educated as a nurse. Based on my years of experience in senior leadership roles at PVH, I am familiar with PVH's day-to-day operations, business, and financial affairs. I am authorized to submit this Declaration in support of PVH's chapter 11 petition and the various first day motions described in this Declaration.

2. On December 19, 2018, PVH's board of directors (the "Board") held a special meeting and, by a unanimous voice vote, adopted the resolution (the "Resolution") attached to this Declaration with minutes of the same meeting as **Exhibit A**. The Resolution authorized the filing of PVH's bankruptcy petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. On January 29, 2019 (the "Petition Date"), PVH filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. That same day, PVH also filed the following motions (collectively, the "First Day Motions"):

1

 (a) *Motion For Authority To Use Cash Collateral On An Interim Basis And Scheduling A Hearing Authorizing The Use Of Cash Collateral On A Final Basis* (the "Cash Collateral Motion");

 (b) *Motion For Authority To Pay Pre-Petition Wages And For Related* Relief (the "Payroll Motion");

 (c) *Motion For Order (A) Authorizing Continued Use Of Existing Business Books, Records, And Bank Accounts And (B) Authorizing And Directing Banks And Financial Institutions To Honor And Process Checks And Transfers* (the "Cash Management Motion"); and

 (d) *Motion For Expedited/Emergency Hearing And Approval Of Shortened Objection Period With Respect To Certain First Day Motions* (the "Motion For Emergency Hearing").

4. This Declaration is submitted in support of these First Day Motions.

5. All facts set forth in this Declaration are based on my personal knowledge; on information supplied to me by others within PVH's organization; upon my review of relevant documents; or on my opinion, based on my experience and knowledge of PVH's operations, financial condition, and present liquidity needs. If I were called to testify, I would testify competently as to the facts in this Declaration.

## I.   PVH's Inception

6. In 1967, the Maine Legislature enacted emergency legislation to create PVH's predecessor, Hospital Administrative District #1 (the "District"), based on the determination that doing so "was essential to take care of present day needs so that the people may receive medical attention when needed[.]" P&SL, c. 58, § 1. The District was publicly financed and served patients beginning in 1973, following construction of a hospital. The District's service area included in a large geographic area comprised of the towns of Mattawamkeag, Howland, Enfield, Burlington, Lowell, Lincoln, Springfield, Lee, Passadumkeag, Chester, Winn, Woodville, Seboies, Grand

Falls Plantation, Maxfield, Carroll, Prentiss, Drew Plantation, and Webster Plantation (the "Service Area"). P&SL 1967, c. 58, § 1.

7. The Legislature directed that the District "shall acquire, or construct, maintain and operate a community general hospital for the care of those persons requiring it." *Id.* § 1. The Maine Legislature subsequently expanded this mission in 2000 to expressly include operation of a "hospital or critical access system, including, but not limited to, acute care facilities, long-term care facilities, long-term care facilities, assisted living facilities," office space for physicians and "generally provide for the health, welfare and public benefit of the inhabitants of the district." P&SL 1999, c. 84, Part A, § A-1.

8. Pursuant to the public policy priorities and direction set by the Legislative, the District operated a hospital in Lincoln and provided important medical services to patients in the Service Area for about 28 years.

9. In 2001, the Legislature authorized the dissolution of the District and the transfer of all of its assets (and the assumption or other provision of liabilities) to a non-profit business corporation. P&SL 2001, c. 31, § 2. PVH was incorporated to fulfill that purpose. Unlike the District, PVH is not financed by a local tax assessment. PVH has operated the hospital in Lincoln, Maine, since 2001 and currently serves patients in the same general communities as the Service Area.

## II. PVH's Business And Background Information

### A. Overview Of PVH's Business

10. PVH operates a 25-bed general medical and surgical hospital located in Lincoln, Maine, with approximately 164 employees and 110 full-time equivalent positions. It is devoted to improving the health and quality of life for patients in the Lincoln Lakes Region and the entire

Service Area with exceptional patient care that is compassionate, cost effective, and community-based.

11.   PVH provides the following services to patients in its Service Area: (a) **inpatient services** including end-of-life care, nursing care to support transitions to home ("swing bed" care), and hospitalist services to coordinate inpatient care; (b) **outpatient services** including cardiology testing, emergency department services, lab testing, and outpatient medical procedures (e.g., blood transfusions, injections, would care); (c) a range of **imaging services** including CT scanning, mammography, MRI, and ultrasound; (d) **therapy rehabilitation services** including alternative pain management, occupational therapy, physical therapy, speech therapy; (e) limited **general surgical services** (and providing an operating room to visiting specialists); (f) **primary care services**; (g) numerous types of **specialty care** primarily provided by physicians utilizing PVH's facilities; and (h) support for community groups.

12.   In 2018, there were 6,532 emergency department visits and 28,800 total annual patient visits.  The emergency department has 6 beds.  It is supported by 24-hour coverage of testing facilities, including laboratory testing and radiology.

13.   PVH is the only hospital in Lincoln and plays an important role as a hospital required to provide care to patients for most procedures regardless of their ability to pay, except with respect to two procedures.  The nearest hospitals are in Millinocket (about 35 miles away and a 40-minute drive), Bangor (about 50 miles away and a 50-minute drive), and Dover-Foxcroft (about 47 miles away and a 60-minute drive).  Some patients within PVH's Service Area are located about 40 miles away from and a 45-minute drive to Lincoln, and about 90 miles away from and a 100-minute drive to Bangor.  There is no local public transportation to PVH, and those patients face long travel times to access hospital medical care.  If PVH shuts down, then many

patients in the Service Area would face even longer travel times to obtain hospital services. Increased distances to emergency rooms are correlated with worse health outcomes. Kelly, C., Hulme, C., Farragher, T., & Clarke, G., *Are differences in travel time or distance to healthcare for adults in global north countries associated with an impact on health outcomes? A systematic review*. BMJ open, *6*(11), e013059. doi:10.1136/bmjopen-2016-013059 (No. 24, 2016), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5178808/# (last visited Dec. 18, 2018).

14.     By virtue of PVH's rural location, size, and certain services that it provides, it qualifies as and is a critical access hospital. Congress created the critical access hospital designation in 1997 in order to reduce the financial vulnerability of rural hospitals while also ensuring that essential health services are available to rural communities. *See* RHIhub, Critical Access Hospitals, https://www.ruralhealthinfo.org/topics/critical-access-hospitals (last visited Jan. 9, 2019). This designation allows PVH to receive reimbursement from Medicare and Medicaid at a rate of 101% of allowable costs rather than being reimbursed based on a set fee schedule. To meet the designation criteria, a hospital must be 35 miles from the nearest hospital, maintain no more than 25 inpatient beds, and have 24 hour emergency services. 42 C.F.R. §§ 485.610(c), 485.618(a), 485.620. PVH meets these criteria.

15.     PVH currently has 25 licensed beds and the average daily census is 4 patients. As of this filing, there are 8 inpatients located at PVH. Acute inpatients are typically discharged within 96 hours.

    **B.     Events Leading Up To This Filing**

16.     Lincoln Paper and Tissue, LLC (the "Mill"), commenced a case under chapter 11 of the Bankruptcy Code in September 2015. *See In re Lincoln Paper And Tissue, LLC*, Case No. 15-10715 (Bankr. D. Me.). The Mill's bankruptcy case resulted in closure of the Mill's facility

5

and the loss of many jobs in the community. PVH is now the largest private sector employer in the region.

17. Following the closure of the Mill, PVH suffered significant declines in patient enrollment and revenue. PVH has spent the last 18 to 24 months making operational changes to adapt to lower patient revenue, so that it can continue to provide high-quality health care to patients throughout the entire Service Area. This has included three significant reductions in workforce and operational changes targeted at reducing costs. One challenge PVH has navigated in its restructuring is the fact that the majority of its revenue (67%) comes from government payors that reimburse it based on 101% of allowable costs. (Commercial insurance (which account for about 25% of PVH's revenue) typically pays more than Medicare and Medicaid for the same services.[1]) Consequently, PVH has focused on operational changes and cuts to those expenses that are not reimbursed at 101% of reasonable costs.

18. These operational changes have started to turn the business in the right direction. The following chart summarizes PVH's fiscal picture from 2016 through PVH's current 2019 budget. The current budget did not contemplate a chapter 11 case. "Deductions from Revenue" identified in the chart include contractual adjustments, allowances for bad debt, and charity care.

(Chart on following page)

---

[1] Private pay patients account for about 8% of PVH's revenue.

6

|  | 2016 | 2017 | 2018 (Estimated) | 2019 (Budgeted) |
|---|---|---|---|---|
| Total FTEs | 162 | 149 | 116 | 110-116 (est) |
| Gross Patient Revenue | $35,453,704 | $33,791,645 | $32,790,981 | $33,675,879 |
| Net Patient Revenue | $21,125,200 | $20,118,416 | $18,458,998 | $18,378,056 |
| Deductions from Revenue | 40.40% | 40.50% | 43.70% | 45.40% |
| Operating Expenses | $23,462,638 | $22,271,452 | $19,600,746 | $18,854,786 |
| Net Income/Loss | ($1,995,989) | ($1,572,709) | ($837,104) | ($211,577) |
| EBITDA | ($886,206) | ($524,091) | $110,550 | $530,412 |

19. While these changes have significantly improved PVH's cash flow, PVH continues to be unable to service its annual debt service, other necessary expenses, and aging payables at the same time.

20. A chapter 11 reorganization will facilitate a restructuring of PVH's balance sheet and implementation of more operational changes to boost earnings and bring much-needed financial stability to PVH.

**C.     PVH's Pre-Petition Secured Debt Structure**

21. PVH's pre-petition secured debt structure is described in the following paragraphs. This description is based on a preliminary investigation. PVH, as debtor and debtor-in-possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

### 1.  **USDA/Rural Development**

22.  Based on a review of relevant documents, it is my understanding that USDA claims to be a secured creditor of PVH by virtue of PVH's execution and delivery of several term promissory notes dated on or about March 21, 2007 (the "USDA Notes"). The combined original principal balance of the USDA Notes was approximately $3.7 million. USDA may claim a mortgage interest (the "USDA Mortgage") in PVH's hospital campus to secure the USDA Notes. The hospital campus is located at 7 Transalpine Road, Lincoln, Maine. USDA also may claim a security interest in, among other things, PVH's accounts receivable, pursuant to a certain loan agreement between USDA and PVH (the "USDA Loan Agreement").

23.  PVH is the sole member of Alpine Health Services, Inc. ("Alpine"). Alpine owns certain real estate located at 47 Bridge Street, West Enfield, Maine (the "Non-Debtor Property"). USDA may claim a mortgage (the "Alpine Mortgage") in the Non-Debtor property to secure obligations under a promissory note Alpine executed and delivered to USDA in 2007 (the "Alpine Note"). The Non-Debtor Property is leased to Health Access Network ("HAN"), a federally qualified health center. HAN provides primary care in the region and is an important referral source to PVH. PVH values its relationship with HAN.

24.  In the fall of 2017, PVH entered into discussions with USDA aimed at reamortizing its existing loans in order to improve cash flow. PVH understands that USDA is unable, in the absence of a court proceeding, to reduce the principal balance of its loans to existing borrowers. Prior to completing the reamortization request, PVH learned that it would likely have a significant and unexpected liability to the state Medicaid program, known as MaineCare, for overpayments to the hospital. These overpayments are the result of the prospective interim payments having

8

been set at too high a level given, among other things, declining patient enrollments. Overpayments like these are not uncommon for similarly situated hospitals.

25.  The reamortization request was placed on hold.

26.  PVH has not made debt service payments to USDA since 2017.

27.  PVH and USDA have remained in regular contact since the fall of 2017 and have had a productive working relationship throughout PVH's debt restructuring, including in the months prior to the Petition Date.

### 2.  Maine Health And Higher Educational Facilities Authority

28.  Acting on behalf of bond holders, Maine Health and Higher Educational Facilities Authority ("MHHEFA") may claim an interest in PVH's hospital campus, accounts receivable, and other intangible income-producing property to secure obligations that may be owed pursuant to a loan dated June 1, 2012 (the "MHHEFA Loan"). The original principal balance of the MHHEFA Loan was $927,968.96.

### 3.  McKesson Corporation

29.  McKesson Corporation is an inventory supplier of PVH. McKesson may claim a security interest in PVH's accounts receivable, among other things.

### 4.  Cardinal Health

30.  Cardinal Health is an inventory supplier of PVH. Cardinal may claim a security interest in PVH's accounts receivable, among other things.

### 5.  Machias Savings Bank

31.  Machias may claim a mortgage interest in certain condominium units owned by PVH (the "Condos") to secure a promissory note in the original principal amount of $264,000. PVH intends to use the Condos in its reorganization effort. The Condos house physician practices.

### D. Significant Unsecured Obligations

32. Below is a description of significant unsecured claims against PVH. This description is based on a preliminary investigation only. PVH, as debtor and debtor-in-possession, reserves all rights to challenge any of the following loans, transactions, and claims, to the extent permitted under applicable law, following a complete investigation.

#### 1. Machias

33. On or about February 14, 2013, PVH executed and delivered a revolving line of credit note ("LOC") to Machias with a maximum principal balance of $1.5 million. To the extent that the obligations under the LOC are valid and enforceable, PVH's books and records reflect that the current outstanding balance is approximately $960,100 (as of the Petition Date). PVH has typically brought the balance due under the LOC to zero in February of each calendar year. PVH anticipates being unable to do so this February. PVH is not aware of any collateral securing this obligation.

34. PVH last drew funds from the LOC with Machias in May 2017.

#### 2. Medicaid/MaineCare

35. PVH receives weekly prospective interim payments from MaineCare, a program administered by the Maine Department of Health and Human Services ("DHHS"). PVH completes annual cost reports that are used to establish whether PVH has been under- or overpaid for a specific year. As mentioned above, by virtue of being a critical access hospital, PVH obtains reimbursement of 101% of allowable costs. There are many types of costs that PVH incurs that are not allowable. This includes, for example, the cost of PVH's hospitalists, medical doctors who coordinate care for inpatients. MaineCare reconciliations are based on annual amounts paid to PVH following the submission of cost reports for specific years submitted to the agencies that

oversee the Medicare and Medicaid (MaineCare) programs. However, DHHS does not always complete these reconciliations promptly after the year in question and overpayment determinations may be made many years later.

36. PVH had multiple meetings with DHHS in the spring of 2018 regarding PVH's fiscal outlook and restructuring plans in light of the overpayment claims. At PVH's request, DHHS granted PVH a moratorium on repayment of overpayments for a period of between 90 and 120 days during which time PVH continued to receive the full amount of Medicaid payments to which it was due. The purpose of this moratorium was to provide PVH with breathing room while working on a restructuring plan.

37. Subsequently, on or about November 7, 2018, PVH entered into a certain Payment Agreement with the Maine Department of Health and Human Services ("DHHS") with respect to certain alleged overpayments by MaineCare to PVH. A copy of the Payment Agreement is attached to this Declaration as **Exhibit B**. The Payment Agreement recites the amounts of alleged overpayments for 2009, 2010, 2011, 2015, 2016, and 2017. DHHS agreed in the Payment Agreement that each of the "overpayments are and shall remain separate, unrelated obligations to the Department."

### 3. Medicare

38. PVH also receives prospective interim payments from Medicare. The Medicare program is administered by the federal Centers for Medicare and Medicaid Services ("CMS"). PVH books and records reflect a payable to CMS in the approximate amount of $628,304 on account of overpayments, though this amount is not final and is subject to change. In September 2018, PVH reamortized certain obligations with CMS and reduced its payment from just under

11

$32,000 monthly to $13,956.26. Doing so enlarged the maturity date of this agreement through July 2020. Interest is accruing at 10% annually.

    4. **Anthem, Inc.**

39. PVH also receives prospective interim payments from Anthem, Inc., or a local affiliate ("Anthem"). Last fall, PVH discussed an agreement with Anthem to resolve certain under- and overpayments for 2016 and 2017. Anthem contended that the net amount owed to it on account of these under- and overpayments was $138,439.09. The parties had drafted an agreement to provide for weekly offsets in the amount of $5,000.00 for approximately 28 weeks. This agreement was not signed.

### III. The Necessity For Filing

40. PVH's bankruptcy was necessary for several reasons. First, many rural hospital patients often have no commercial insurance or are underinsured and use emergency room services in lieu of primary care providers. PVH is required to treat these patients, often with no reimbursement or pay in return. Second, Medicare and Medicaid reimbursement margins have fallen in recent years, so even reimbursement through these channels has resulted in reduced income. Third, the closure of the Mill led to significant job losses and, correspondingly, fewer patient visits. Those patients who do visit PVH are often uninsured or underinsured. Fourth, PVH has significant overpayment liability to MaineCare from years ago that must, to the extent possible, be restructured or reduced. Fifth, the State of Maine has not yet implemented Medicaid expansion. It is my understanding that PVH is projected to benefit from between $750,000 and $1 million of additional revenue following the implementation of Medicaid expansion.

41. PVH is generally not paying all of its debts as they become due because it lacks the ability to do so.

42. PVH has more than 400 vendors in its accounts payable system, many of whom are owed money as of this filing. It is difficult, if not impossible, to negotiate with a large body of creditors outside of chapter 11.

43. PVH desires to propose and confirm a plan to restructure PVH's balance sheet while also implementing further operational changes to boost earnings. I do not believe that it is possible to restructure the USDA Notes with a reduction in the principal balance outside of chapter 11.

44. Health care services provided by PVH are critical not only to Lincoln, but to all of the residents living and visiting the Service Area. PVH's closure could lead to worse patient health outcomes for some patients.

45. PVH's goal in filing for bankruptcy is to restructure its balance sheet to enable it to stay open, continue providing services to the Service Area, and make further operational changes to ensure the delivery of high-quality hospital services. If it is unable to successfully navigate restructuring, it may be forced to close. Such a closure would significantly and negatively impact the Town of Lincoln (already damaged by the closure of the Mill) and the entire Service Area.

## IV.    The First Day Motions

46. I have reviewed each of the First Day Motions, including related exhibits, and believe that the relief sought in each of the First Day Motions is necessary to avoid irreparable harm to PVH and are necessary for PVH to successfully exit from chapter 11 protection. A failure to grant them would likely lead to cessation of business operations or a forced liquidation in state court. PVH does not consent to conversion of this case to one under chapter 7.

### A.     <u>The Cash Collateral Motion</u>

47. Capitalized terms not defined herein and used during the following discussion of the Cash Collateral Motion shall have the meaning ascribed to them in the Cash Collateral Motion.

48. In preparation for this filing, PVH and its advisors examined PVH's options for liquidity and debt restructuring, but it did not appear that there was any feasible out-of-court restructuring alternative to chapter 11. This was true in large part due to the fact that USDA's regulations restrict its ability to write down any principal balance consensually outside of a bankruptcy proceeding.

49. During these months, PVH and its advisors also analyzed PVH's cash flow and determined that the business is capable of operating under the terms of the Proposed Budget without any diminution in the value of Cash Collateral during the Relevant Period. The ending balance of PVH's Cash Collateral at the end of the Relevant Period is equal to or greater than the starting balance of Cash Collateral at the beginning of the Relevant Period.

50. Without access to the use of Cash Collateral in chapter 11, PVH would be unable to pay its general operating expenses immediately, including, without limitation, employee payroll and other benefits, payments for necessary medical supplies, and for the various other items reflected in the Proposed Budget. Upon PVH's inability to pay these expenses, PVH would have to immediately cease operations, which would result in the destruction of substantial value that would otherwise inure to the benefit of PVH's creditors. The human cost of such a closure would also be significant and adverse health consequences to patients in the Service Area are highly likely.

51. In addition, PVH requires use of its Cash Collateral to have adequate time to formulate and propose a chapter 11 plan of reorganization. PVH currently believes, in consultation

with its advisors, that confirmation of a chapter 11 plan is its best prospect for ensuring continued access to hospital health care in Lincoln and the entire Service Area.

52. As of December 31, 2018, PVH had accounts receivable, net of uncollectible amounts, totaling approximately $2.75 million.

53. Attached to this Declaration as **Exhibit C** is a list of PVH's deposit accounts and, to the best of my knowledge, their balances as of the close of business on January 28, 2019, and a description of the purpose and source of funds for each of these accounts.

54. Attached to the Cash Collateral Motion is PVH's Proposed Budget. Each of the expenditures in the Proposed Budget is reasonable and necessary in order to continue the provision of appropriate health care services to the patients of PVH without harming the value of PVH as a going concern.

### B. The Payroll Motion

55. Capitalized terms not defined herein and used during the following discussion of the Payroll Motion shall have the meaning ascribed to them in the Payroll Motion.

56. I understand that by the Payroll Motion, PVH seeks authorization to pay certain accrued wages, salaries, and payroll-related expenses, to make payments to certain insurance companies, and to direct all applicable banks or financial institutions to receive, process, honor, and pay any and all checks drawn on PVH's accounts in relation to amounts authorized to be paid under the Payroll Motion.

57. Based on the immediately prior period's payroll, the pre-petition compensation attributable to the period from January 20, 2019 through the Petition Date for Employees will be approximately $160,988. There are no outstanding amounts due for employer-paid contributions to employee benefit plans. PVH makes these payments monthly for the provision of services or

coverage for the current month. Approximately $1,463 is withheld for Union dues every pay period.

58. I believe any delay in paying compensation and contributions to employee benefit programs will damage PVH's relations with Employees, cause irreparable harm to morale, and harm the value of PVH's business, property, and assets. Given PVH's location in Lincoln, Maine, the hospital expends significant effort and cost training and retaining its current employees and recruiting medical providers. If Employees were to terminate their employment with PVH because they are not promptly paid and benefit programs are not maintained, then it would be difficult to find replacement employees. The Employees' skills, knowledge, and understanding of PVH's business and operations are essential to the effective operation of PVH's business and to a successful reorganization of this business in a fashion that maximizes the return to creditors and other parties-in-interest.

59. To maintain and preserve the morale of any continuing labor force while restructuring occurs, I believe that it is essential that PVH be permitted to pay Employees the compensation and deductions accrued prior to the Petition Date.

60. Absent the relief requested in the Payroll Motion, I believe that PVH's Employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. I believe that many Employees would seek other employment if not paid and that PVH could lose critical Employees who would be difficult to replace. I believe that the loss of these Employees would jeopardize PVH's continuing business operations and its ability to reorganize. Moreover, I understand that applicable state law may require payment of wage-related claims upon the termination of such Employees.

61. No Employee will receive, in the aggregate, more than $12,850.

### C. The Cash Management Motion

62. Capitalized terms not defined herein and used during the following discussion of the Cash Management Motion shall have the meaning ascribed to them in the Cash Management Motion.

63. I understand that by the Cash Management Motion PVH seeks authority for PVH to continue its pre-petition cash management system (the "Cash Management System") and to use pre-petition bank accounts and business forms. I believe this relief is critical to avoid disruption to PVH's operations. The Cash Management System includes several accounts located at several different banks and one investment account described in **Exhibit C**. It is my understanding that opening new bank accounts could cause significant delays in PVH's receipt of electronic payments from its payors, including Medicare, Medicaid, and Anthem. This would cause irreparable harm to PVH due to the fact that, absent continued payments on the current schedule, PVH would lack sufficient funds to maintain operations.

64. PVH also uses a variety of business forms. PVH requests permission to use its existing business forms, such as checks that it prints on stock. PVH will identify its status as a debtor-in-possession on all checks, to the extent that it is required to do so.

65. PVH has a complex accounting system that is tailored to its business needs. Opening new books would be disruptive to accounting functions. PVH's accounting system is capable of delineating between pre- and post-petition transactions.

66. I believe that changing the Cash Management System would result in needless disruption of PVH's business and impede PVH's ability to seamlessly transition into chapter 11.

### D. The Motion For Expedited Or Emergency Hearings

67. Due to the nature of the relief sought by certain of the First Day Motions, PVH seeks expedited or emergency hearings on them, as appropriate in light of the relief requested and the Court's availability, as soon as possible after the Petition Date.

68. PVH seeks immediate relief with respect to the Cash Collateral Motion. Without immediate authority to continue to use Cash Collateral, PVH will be unable to operate its business going forward. The ability to operate its business is essential to PVH's ability to preserve value as a going concern—and to keep patients in the Service Area safe and healthy. Without the ability to use Cash Collateral, PVH would simply be unable to operate. This would jeopardize PVH's reorganization.

69. PVH's ability to continue its operations depends, to a significant extent, on its ability to retain its Employees. If the Payroll Motion is not heard on an expedited or emergency basis, then PVH will not be able to pay its Employees in an ordinary and timely manner. That inability would almost certainly lead to a loss of employees at the time when PVH needs them most. This would jeopardize PVH's continuing business operations and ability to reorganize.

70. PVH also seeks immediate authority to maintain its existing Cash Management System, bank accounts, and business forms in order to make a seamless transition into chapter 11 and avoid disruptions in receipt of revenue.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: Jan. 28, 2019

_Crystal Landry_
Crystal Landry